**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE (Wilmington)**

| | | |
|---|---|---|
| **TRANSCEND MEDICAL, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 13-830** |
| | : | |
| **GLAUKOS CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                                                         **September 18, 2015**

**MEMORANDUM OPINION**

This case involves a patent dispute centering around devices to treat glaucoma. Both parties, Transcend Medical, Inc. and Glaukos Corporation, have developed technology to drain excess fluid from the eye, a common cause of glaucoma. Glaukos' technology called "iStent" is protected by United States Patent Nos. 7,857,782 ("Patent '782"), 8,075,511 ("Patent '511") and 8,579,846 ("Patent '846"), which are the patents-in-suit.[1]

Transcend explains that it "heard through conversations with various individuals" that Glaukos claimed Transcend could not commercialize its technology without infringing the patents-in-suit. Thereafter, the parties exchanged letters disagreeing about the scope of the patents. (2d Am. Compl. ¶¶ 9-11.) Unable to resolve the dispute, Transcend filed a complaint seeking declaratory judgment of non-infringement and invalidity. Transcend also alleges that the patents are unenforceable due to inequitable conduct. Glaukos in turn filed counterclaims for infringement.

---

[1] A fourth patent owned by Glaukos, United States Patent No. 7,850,637 ("Patent '637"), was at issue prior to claim construction. Based on the parties' summary judgment submissions it is clear that the claims construction resolved the issues as to that fourth patent. (Def.'s Br. p. 1; Pl.'s Mem. p. 2 n.3.)

1

Transcend has alleged that Glaukos intentionally concealed from the United States Patent and Trademark Office ("USPTO") the identity of one of the actual inventors of the protected invention. Presently before me is Glaukos' motion for summary judgment regarding Transcend's request for a declaratory judgment of unenforceability due to inequitable conduct.[2] Because there are genuine issues of material fact regarding the issue of intent, I will deny Glaukos' motion.

I.    **FACTUAL RECORD**

A detailed statement of the facts, transactions and numerous USPTO filings leading up to the issuance of the patents-in-suit is necessary to fully understand Transcend's allegations of inequitable conduct. The varying facts also help to amplify why this dispute is not suited for resolution at this juncture and requires submission to a fact finder. Unless otherwise noted, the following facts are undisputed:

A.   **USPTO Events Prior to the Issuance of the Patents-in-Suit**

On November 5, 1999, Olav Bergheim, an entrepreneur and general partner of a venture capital firm called Domain Associates ("Domain"), contacted Dr. Richard Hill,[3] who was then a professor of ophthalmology at the University of California, Irvine ("UCI"), to discuss treatment options for a member of Bergheim's family who had been diagnosed with glaucoma. Richard Hill described his concept for trabecular bypass surgery in which a small stent would be implanted into the eye. (Pl.'s Ex. C, Richard Hill Dep. 73:24-25; Ex. K; Ex. L.)[4]

---

[2] Transcend has filed summary judgment motions on its non-infringement and invalidity claims. These motions are addressed in separate opinions.

[3] Until 2006, James Hill, an attorney at Knobbe Martens Olson & Bear ("Knobbe") was involved in prosecuting Glaukos' patent portfolio. (Pl.'s Ex. V, James Hill Dep. 18:5-18.) For clarity purposes, I will refer to Richard Hill and James Hill by their first name and last names.

[4] In support of its opposition to Glaukos' motion for summary judgment, Transcend submitted exhibits as attachments to the Declaration of Julian du Vergier. I will refer to these exhibits as "Pl.'s Ex. ___."

On December 8, 1999, Richard Hill and Bergheim met with Dr. Morteza Gharib, an engineering professor. At this meeting, Richard Hill again described his concept for trabecular bypass surgery. (Pl.'s Exs. K, L.)

Following this meeting, Richard Hill, Bergheim and Gharib founded Glaukos to develop a device they referred to as a "micro-bypass stent."[5] Prior to co-founding Glaukos, Richard Hill had signed a contract with UCI in 1990 by which he agreed to assign to UCI all rights and title to any patentable inventions he developed while employed by UCI. (Pl.'s Ex. J; Ex. L; Ex. Q, Bergheim Dep. 10:14-22.)

Dr. Hosheng (Roger) Tu served as Glaukos' president. Barbara Niksch served as Glaukos' Director of Regulatory Affairs and Quality Assurance. (Pl.'s Exs. O and PPP) Greg Smedley was responsible for the research and development "side of the business, intellectual property development and . . . engineering." David Haffner focused on "manufacturing methods . . . and materials for the device." (Pl.'s Ex. QQQ, Smedley Dep. 25:22-25, 26:19-21.)

James Hill and William Nieman, attorneys at Knobbe, were responsible for prosecuting Glaukos' patent portfolio from 2000 until 2006. In 2006, William Shreve of Knobbe assumed that responsibility from James Hill and William Nieman. (Pl.'s Ex. S, Shreve Dep. 17:4-24; Ex. V, James Hill Dep. 18:5-18.)

On February 24, 2000, Richard Hill submitted a "Confidential Disclosure and Record of Invention Form" and a memorandum entitled "Trabecular Bypass Surgery" to UCI. The documents describe features of Richard Hill's trabecular bypass surgery concept and lists Domain, Bergheim's company, as a potential licensee or research sponsor. (Pl.'s Ex. K.) On

---

[5] Glaukos was formerly known as Glayco Corporation. (Ans. p. 7.) For the sake of consistency, I will simply refer to the entity as Glaukos.

3

March 22, 2000, UCI faxed a copy of the memorandum to Bergheim. Tu read this memorandum. (Pl.'s Ex. DD; Ex. N, Tu Dep. 94:7-9.)

In the spring of 2000, Nieman and UCI representatives met to discuss Richard Hill's contributions to the technologies being developed at Glaukos. As a result of those conversations, James Hill prepared a common patent specification on behalf of Glaukos and UCI. Using that specification, UCI incorporated claims it understood to reflect Richard Hill's distinct contributions and filed United States Patent Application No. 09/549,349 ("Application '349") on April 14, 2000. Application '349 named Richard Hill as the sole inventor. (Def.'s Ex. 30, James Hill Dep. 42:22-45:7, 54:6-57:24.)[6]

Also on April 14, 2000, Glaukos filed its first patent application with the specification prepared by James Hill (U.S. Patent Application No. 09/549,350 ("Application '350")). Application '350 was prepared by Tu, who copied portions of Richard Hill's UCI memorandum verbatim into Application '350. (Pl.'s Ex. Z; N, Tu Dep. 89:3-103:20; Def.'s Ex. 30, James Hill Dep. 42:22-45:7, 54:6-57:24.) Application '350 issued as United States Patent No. 6,638,239 ("Patent '239") and names Bergheim and Gharib as the inventors. Patent '239 includes claims to an implant, instrument for placing the implant and methods for placing the implant into Schlemm's canal. (Pl.'s Ex. BB.) Application '350 and the above mentioned Application '349 filed by UCI claimed distinct subject matter. (Def.'s Ex. 30, James Hill Dep. 42:22-45:7.)

On May 22, 2000, Richard Hill, Bergheim, Gharib and Tu signed a document "memorali[zing]" an oral agreement that was in place from December 8, 1999 to May, 22, 2000. The document reflects that Richard Hill agreed to assign to Glaukos any inventions conceived or reduced to practice at Glaukos meetings held during that time period. (Pl.'s Ex. EE.)

---

[6] In support of its motion for summary judgment, Glaukos submitted exhibits as attachments to the Declaration of Joshua Stowell. I will refer to the exhibits attached to the Declaration of Joshua Stowell as "Def.'s Ex. ___."

On June 29, 2000, following discussions regarding Richard Hill's potentially conflicting obligations to UCI and Glaukos, Bergheim sent UCI a copy of Glaukos' "standard consulting agreement." Bergheim did not provide UCI with the agreement signed by Tu, Richard Hill, Bergheim and Gharib on May 22, 2000. In response, David Schetter, Assistant Vice Chancellor of UCI, stated that Glaukos was "creating a potentially dangerous situation where your investment could be compromised by a legitimate challenge based on the consultant's prior employment agreement." (Pl.'s Exs. II-JJ.)

In June of 2000, Tu sent a letter to Nieman with a draft of what would become Glaukos' second patent application (U.S. Application No. 09/704,276 ("Application '276")). Tu's letter states that "[t]he co-inventors in this application shall include Olav, Mory, Richard Hill, and myself. In case the issue of assignment to UCI becomes an obstacle, then Olav shall make final decision on names of the co-inventors." Application '276 was filed on November 1, 2000 and lists Tu, Bergheim and Gharib as inventors. (Pl.'s Exs. AA and CC.)

On July 28, 2000, Nieman sent UCI's attorney a letter stating that absent a resolution of the dispute regarding Richard Hill's contributions, going forward Glaukos intended to "exclude" Richard Hill from "any activities at Glayco which may result in generation of new inventions." (Pl.'s Ex. W.) However, Richard Hill did continue to attend Glaukos brainstorming sessions and weekly meetings. (Pl.'s Ex. N, Tu Dep. 232:17-233:9.) Richard Hill was also on Glaukos' "Trabecular Shunt Project" team, along with Tu, Smedley, Haffner and Niksch. Richard Hill also served on Glaukos' "Shunt Development" and "Applicator Development" teams. (Pl.'s Exs. LL, MM and TTT.)

On March 16, 2001, Tu filed United States Provisional Application No. 60/276,609 ("Provisional Application '609") on behalf of Glaukos. Application '609 lists Smedley, Gharib

and Tu as inventors. The notes attached to Provisional Application '609 state that Hill provided input on the applicator described in the application. (Pl.'s Ex. NN.)

On behalf of Glaukos, Tu prepared a provisional patent application (U.S. Provisional Application No. 60/281,973 ("Provisional Application '973")) which was filed on April 7, 2001. Approximately two weeks prior to filing, Richard Hill instructed Tu to include a "disclosure concerning the 'uveal scleral outflow pathway'" in Provisional Application '973. Tu included such a reference and testified at his deposition that Richard Hill contributed some of the ideas disclosed in Provisional Application '973. Similarly, Bergheim testified that Richard Hill contributed to the design of the implant and delivery instrument claimed in Provisional Application '973. However, Provisional Application '973 states "[f]or record purposes: The following persons have been the co-inventors for a part or all of the disclosures: Greg Smedley, David Haffner, Barbara Niksch, Olav Bergheim and Mory Gharib." Provisional Application '973 incorporates by reference Application '350, Application '276 and Application '609. (Pl.'s Ex. N, Tu Dep. 245:1-250:24; 262:1-264:6; Ex. Q, Bergheim Dep. 60:24-61:16; Ex. QQ.)

In March 2002, Glaukos filed United States Patent Application No. 10/101,548 ("Application '548"). Application '548 claims priority to Provisional Application '609. (Pl.'s Ex. UUU.)

Glaukos did not name Richard Hill as an inventor on any of its patent filings prior to Richard Hill leaving UCI in 2005. James Hill testified, that during his involvement with Glaukos, Tu was the "principal contact giving us new disclosures and telling us who the inventors were." James Hill further testified that, based on his conversations with Tu, it was his understanding that Richard Hill ceased collaborating with Glaukos after completion of the "first or second application." (Pl.'s Ex. V, James Hill Dep. 128:22-129:5; 131:5-132:9.)

6

On November 13, 2006, Glaukos filed United States Patent Application No. 11/598,542 ("Application '542). Application '542 lists Tu, Smedley, Haffner and Niksch as inventors and claims priority to Provisional Application '973. (Pl.'s Ex. QQ.) In 2009, the USPTO indicated that it would allow the claims of Application '542. In response, Shreve, who had assumed responsibility for prosecuting Glaukos' patent portfolio, investigated the inventorship of the claims contained in Application '542 because the claims had changed during the course of prosecution. (Pl.'s Ex. NNN.)

Shreve first contacted Haffner, the only named inventor still working at Glaukos in 2009. Shreve testified that he asked Haffner "where the concept of uveoscleral outflow came from." According to Shreve, Haffner stated he did not remember and recommended that Shreve contact Tu. Tu had left Glaukos at some point prior to 2009 but continues to conduct a monthly intellectual property search for Glaukos. Shreve then contacted Tu who stated that he, Smedley, Haffner and Niksch contributed to the claimed invention. Based on Tu's representations, Shreve retained the list of inventors that had been submitted with Application '542. (Def.'s Ex. 9, Shreve Dep. 70:-1-24, 86:15-87:24; Pl's Ex. N, Tu Dep. 59:22-60:24; Ex. VVV.)

On July 21, 2009, the USPTO allowed the claims contained in Application '542 and the application was issued as United States Patent No. 7,563,241 ("Patent '241"). (Def.'s Exs. 5-6.)

### B. The Patents-in-Suit

In 2008, 2009 and 2011, Glaukos filed applications that were later issued as the patents-in-suit. The claims of the patents-in-suit are directed to the treatment of glaucoma through the use of an implant system to drain fluid to the uveal scleral outflow pathway. The inventors originally named on those patents were Tu, Smedley, Haffner and Niksch. (Def.'s Exs. 1-3.) Shreve testified that he determined that those individuals should be named as inventors on the

patents-in-suit based upon the earlier conversations he had with Tu described above. (Pl.'s Ex. S, Shreve Dep. 69:2-25, 86:9-89:16.)

In 2013, Glaukos filed petitions to correct the inventorship of the patents-in-suit by adding Richard Hill as an inventor. Glaukos explains that during its document collection in connection with the case before me it uncovered the memorandum that Richard Hill had provided to UCI in 2000. In response, Shreve interviewed Richard Hill who stated that he did in fact contribute the idea for placement of an implant to drain aqueous humor to the uveal scleral outflow pathway. Thereafter, Shreve concluded that Richard Hill should have been named as an inventor on the patents-in-suit and filed petitions to correct the inventorship in the patents-in-suit as well as "in the other five patent assets that had included claims directed to uveoscleral drainage." (Def.'s Ex. 9, Shreve Dep. 152:21-153:3, 159:9-21, 165:14-17; Ex. 14; Ex. 21.)

In connection with the change in inventorship, Glaukos agreed to pay UCI $2.7 million and a 2.5% royalty on the sales of iStent products as well as attorneys' fees UCI incurred in connection with this case. (Pl.'s Ex. B.)

In light of the extended history detailed above, Transcend premises its inequitable conduct claim on the theory that Richard Hill was intentionally omitted as an inventor of the patents-in-suit.

## II. STANDARD OF REVIEW

A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving

party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. Id. at 248. In order to avert summary judgment motion, the non-moving party cannot rely on speculation or conclusory allegations, but rather must cite to the record. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court considers the evidence in the light most favorable to the non-moving party. Anderson, 477 U.S. at 256.

Inequitable conduct is a defense to patent infringement that, if proved, bars enforcement of a patent. Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011). To prove inequitable conduct, it must be demonstrated that the patent applicant: (1) misrepresented or omitted certain information in applying for the patent; (2) that information was material; and (3) the misrepresentation or omission was made with the specific intent to deceive the USPTO. American Calcar, Inc. v. American Honda Motor Co., Inc., 651 F.3d 1318, 1334 (Fed. Cir. 2011).

A party alleging inequitable conduct must demonstrate that the patent applicant acted with the specific intent to deceive the USPTO and that but for its omission or misrepresentation the USPTO would not have issued the patent. Therasense, 649 F.3d at 1289-92. Intent to deceive must be shown by clear and convincing evidence, but in assessing materiality, "the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction." Id.

As patent applicants rarely admit intentionally misleading the USPTO, intent to deceive can be inferred from the facts and circumstances surrounding the conduct at issue. Merck & Co., Inc. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1422 (Fed. Cir. 1989). Where intent is inferred

from indirect and circumstantial evidence, the clear and convincing standard is met only when the intent to deceive is "the single most reasonable inference able to be drawn from the evidence." Therasense, 649 F.3d at 1290 (quoting Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008)). In other words, the evidence "must be sufficient to require a finding of deceitful intent in light of the circumstances." Id. (quoting Kingsdown Medical Consultants, Ltd. v. Hollister Inc., 863 F.2d 867 (Fed. Cir. 1988)). In evaluating whether conduct was inequitable, I note that the USPTO imposes a duty of candor on all individuals associated with the filing of a patent. 37 C.F.R. § 1.56(a). This duty includes an obligation to disclose all material information known at the time of filing. 37 C.F.R. § 1.56(b).

### III. ANALYSIS

As previously noted, the premise of Transcend's inequitable conduct claim is that Glaukos should have named Richard Hill as an inventor but intentionally left his name off the patents-in-suit to deceive the USPTO and prevent UCI from claiming ownership rights. There are two essential elements of an inequitable conduct claim: intent to deceive and materiality. The parties do not dispute the materiality element and agree that the failure to properly name Richard Hill as an inventor was a material omission. However, the parties vigorously dispute whether the failure to do so was done with the specific intent to deceive the USPTO.

Regarding this element, Glaukos argues that summary judgment should be granted because (1) Transcend cannot establish that the single most reasonable inference from the evidence is that Richard Hill was omitted from the list of inventors in the patents-in-suit with the intent to deceive the USPTO and (2) Transcend's main theory of inequitable conduct focuses on allegations concerning Patent '239 which is not at issue in this lawsuit and, therefore, any

supposed inequitable conduct in connection with Patent '239 has no legal effect on the patents-in-suit.

### A. Evidence of Intent

Glaukos argues that there is no evidence that Tu intentionally misrepresented the inventorship of the uveal scleral outflow claims in the patents-in-suit to Shreve in 2009 with the specific intent to deceive the USPTO. In support, Glaukos argues that Tu's deposition testimony demonstrates that he conveyed his best recollection of inventorship to Shreve in 2009 but that he could not recall whether or not Richard Hill had conceived the idea for a device to drain aqueous humor to the uveal scleral outflow pathway. (Def.'s Br. p. 11) (citing Ex. 18, Tu Dep. 227:1-232:22.))

Alternatively, Glaukos argues, even if intent to deceive is a reasonable inference, the evidence supports at least two other reasonable inferences that do not involve intent to deceive. First, Glaukos urges that a reasonable inference is that Tu did not know Richard Hill contributed the idea for a device to drain aqueous humor to the uveal scleral outflow pathway.

The second reasonable inference offered by Glaukos is that Tu simply did not remember that Richard Hill contributed to the invention. Glaukos alleges that, even assuming Tu appreciated Richard Hill's contributions in 2001, nothing in the record suggests that Tu remembered those contributions when he provided Shreve with his recollections of inventorship in 2009. Glaukos further contends that Transcend has identified no motive for Tu to supposedly lie about inventorship in 2009 because Tu had already left Glaukos to pursue other interests. As such, Glaukos urges that it is "unreasonable and implausible" for Tu to carry out a conspiracy to defraud the USPTO over five years after he left Glaukos.[7]

---

[7] Glaukos also argues that its recent correction of inventorship is not a basis for inferring specific intent to deceive. I agree. Pursuant to 35 U.S.C. § 256, patentees may correct an error in the

11

Transcend counters that the single most reasonable inference to be drawn from the evidence is that Tu acted with the specific intent to deceive the USPTO and, alternatively, at a minimum, genuine issues of material fact exist regarding intent thus precluding summary judgment. According to Transcend, the evidence reveals a pattern of deceptive conduct by Glaukos intended to mislead the USPTO and even its own counsel about Richard Hill's inventive role in order to avoid Richard Hill's assignment obligations to UCI.

In support, Transcend points to the following evidence: (1) the letter Tu wrote in June 2000 wherein he acknowledges that Richard Hill's assignment obligation to UCI could be an "obstacle;" (2) Glaukos told UCI that as of July 2000 Richard Hill was no longer involved in Glaukos' inventive affairs even though he was; (3) Tu submitted the list of inventors for Provisional Application '973, omitting Richard Hill, approximately two weeks after Richard Hill instructed Tu to include a uveal scleral outflow disclosure in the application; and (4) Tu again failed to mention Richard Hill when asked to list the inventors in 2009. Transcend urges that the only reasonable inference that can be drawn from these facts is that the failure to name Richard Hill as an inventor was done with the specific intent to deceive the USPTO.

Transcend also disputes Glaukos' assertion that the record supports an inference that Tu might not have known that Richard Hill contributed to the idea for the uveal scleral outflow drainage device. Transcend notes that Richard Hill personally told Tu to include such a disclosure just two weeks before Provisional Application '973 was filed.

Transcend likewise contends that the evidence does not support Glaukos' assertion that a second reasonable inference is that Tu's later failure to name Richard Hill as an inventor in 2009 was a product of the passage of time and a bad memory. In support, Transcend notes that Tu

naming of inventors without invalidating the patent if the error was the product of mistake rather than deceptive intent. Glaukos correctly notes that to "assume[e] that a correction of inventorship proves deceptive intent" would nullify the purpose of Section 256.

testified that he did not mention Richard Hill as an inventor because Shreve did not specifically ask about Richard Hill's involvement. (Pl.'s Ex. TT, Tu Dep. 375:6-376:19.) Transcend correctly asserts that this testimony could be found to be inconsistent with Shreve's testimony that he asked Tu an open-ended question about who invented what. (See Pl.'s Ex. S, Shreve Dep. 87:25-88:16.)

Additionally, my independent review of the record reveals that a fact finder could conclude that Tu offered multiple potentially conflicting explanations: Tu testified that he failed to mention Richard Hill because (1) he could not remember whether Richard Hill contributed to the idea of a uveal scleral drainage device, (Def.'s Ex. 18 Tu Dep. 232:13-22);[8] (2) Shreve did not specifically inquire about Richard Hill's involvement, (Pl.'s Ex. TT, Tu Dep. 375:6-376:19); and (3) he could not recall how he arrived at the list of inventors he provided to Shreve in 2009. (Def.'s E. 369:6-370:15.) I also note that Tu's testimony is difficult to parse based on a review of his deposition because the parties' attorneys and Tu appear to have talked over each other at points rendering critical portions of the deposition transcript somewhat unclear.

Viewed in the light most favorable to Transcend, a reasonable fact finder could conclude that the evidence fails to support an inference that Tu was unaware that Richard Hill contributed the idea for a uveal scleral outflow path device given the relatively short lapse of time between Richard Hill's instruction and the filing of Provisional Application '973 in 2001. Similarly, viewed in the light most favorable to Transcend, a reasonable fact finder could likewise conclude that the evidence does not reasonably support an inference that Tu's failure to name Richard Hill as an inventor in 2009 was simply a product of a bad memory. Therefore, I find that the

---

[8] I note that the transcript is unclear as to whether Tu stated that he could not remember if Richard Hill contributed to the relevant disclosure at the time he responded to Shreve's inquiry in 2009 or at the time of his deposition in 2015.

13

evidence could support a finding that intent to deceive is the single most reasonable inference to be drawn at this stage of the proceedings.

I make these determinations based on consideration of the entire record but note the following as particularly central to my conclusion: Richard Hill was the only founding member of Glaukos with ophthalmology training or glaucoma expertise; as of July 2000 Glaukos told UCI that Richard Hill would no longer be involved in research and development but Richard Hill continued to be involved; Richard Hill told Tu to include a uveal scleral disclosure in Provisional Application '973; shortly thereafter Tu filed Provisional Application '973 with such a disclosure but omitted Richard Hill as an inventor; the patents-in-suit claim priority to Provisional Application '973; the patents-in-suit are directed to systems for increasing drainage to the uveal scleral outflow pathway; and Tu's conflicting testimony regarding why he did not include Richard Hill in his response to Shreve's 2009 inquiry regarding inventorship of the patents-in-suit.[9] As such, a trial is necessary to resolve disputed issues of material fact, assess the credibility of witnesses and more fully develop the record. Therefore, Glaukos' request for summary judgment regarding inequitable conduct is inappropriate.

### B. Patent '239

According to Glaukos, large portions of Transcend's inequitable conduct theory concern Glaukos' alleged conduct in connection with Patent '239 which was directed to an implant and delivery device for draining fluid to Schlemm's canal rather than the uveal scleral outflow pathway. Glaukos argues that the inequitable conduct Transcend alleges in connection with Patent '239 does not have "an immediate and necessary relation" to the patents-in-suit so as to render the patents-in-suit unenforceable. See Consol. Aluminum Corp. v. Foes Int'l Ltd., 910

---

[9] I also note the existence of disputed issues of fact relevant to intent, including Tu's explanation as to why he omitted Richard Hill from the list of inventors.

F.2d 804, 810 (Fed. Cir. 1990). Glaukos contends that Transcend fails to demonstrate the requisite connection because Patent '239 and the patents-in-suit have no common patents in their chain and claim distinct inventions.

Transcend responds that Glaukos' assertion that it is unable to rely on inequitable conduct in relation to earlier filed applications is misplaced. First, Transcend argues that the failure to name Richard Hill on the earlier applications and the patents-in-suit were part of an ongoing pattern of deception aimed at the USPTO and designed to avoid Richard Hill's assignment obligations to UCI. Transcend also urges that it has identified inequitable conduct in relation to the patents-in-suit. As discussed above, I agree that Transcend has offered sufficient evidence of inequitable conduct in connection with the patents-in-suit to withstand summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, Glaukos' motion for summary judgment of no inequitable conduct is denied. An appropriate order follows.